**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

NADINE FRAKES,

    *Plaintiff,*         **CASE NO.:**

v.

CITY OF BOYNTON BEACH;
JOSEPH DEGIULIO; THOMAS HAAS;
ALYSSA PACIELLO; and JODI SCOTT,

    *Defendants.*

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Nadine Frakes files this action against Defendants for violations of 42 U.S.C. § 1983 as follows:

### PARTIES

1.  Plaintiff is a resident of the City of Boynton Beach in Palm Beach County, Florida. She is a person within the meaning of 42 U.S.C. § 1983.

2.  Defendant City of Boynton Beach ("**City**") is a municipal corporation formed pursuant to the laws of the State of Florida, located within Palm Beach County, Florida. As part of its business and to protect the health, welfare, and well-being of its residents and citizens, including Plaintiff, the city operates and maintains the City of Boynton Beach Police Department ("**BBPD**") and employs the BBPD agents described below.

3.  At all times material, the City was and is responsible for the operation, administration, management, and oversight of the BBPD and its employees.

4.  Defendant BBPD Officer Alyssa Paciello ("**Ofc. Paciello**"), Defendant BBPD Officer Jodie Scott ("**Ofc. Scott**"), Defendant BBPD Sergeant Thomas Haas ("**Sgt. Haas**"), and

Defendant BBPD Chief Joseph DeGiulio ("**Chief DeGiulio**") were employees of the Boynton Beach Police Department and were acting within the scope of their employment at the time of the events alleged in their complaint and operating under the color of law. Each is sued individually and in their official capacities.

5.     In connection with the acts, practices, and violations described below, Defendants directly and/or indirectly violated Plaintiff's constitutional rights.

**JURISDICTION AND VENUE**

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for claims arising under 42 U.S.C. § 1983.

7.     This Court has personal jurisdiction over all Defendants.

8.     Pursuant to 28 U.S.C. § 1391, venue is proper in this district because Defendant is subject to personal jurisdiction in this District and because the acts occurred in this District.

**GENERAL ALLEGATIONS**

**A.  Plaintiff's Daughter Passes Away**

9.     At age 30, Plaintiff's adult daughter Michelle was diagnosed with multiple sclerosis.

10.    During the first approximately five years after the diagnosis, Michelle's walking slowly deteriorated.  For the next approximately five years she was in a wheelchair.  For the last approximately five years of her life, Michelle was confined to a bed.

11.    Through it all, Plaintiff cared for her only living child.

12.    For the last approximately 10 months of Michelle's life, she was under hospice care in Plaintiff's home in Boynton Beach.

13.     Michelle's condition had deteriorated to a degree that Plaintiff could not touch her without causing surface skin pain. Michelle also could not sit up well and had difficulty swallowing due to MS-related trauma to her epiglottis.

14.     On March 25 and 26, 2023, Plaintiff called the hospice facility (Trustbridge) because Michelle was speaking strangely, in a way that no one could understand.

15.     Trustbridge labeled Michelle's behavior as "terminal agitation."

16.     On March 27, 2023, at approximately 6:30 p.m., Plaintiff called City paramedics because Michelle wanted a pain pill but could not swallow it. They came within minutes, assisted, and left.

17.     Later that night, at approximately 8:08 p.m. Michelle passed away.

18.     Plaintiff sobbed and held her hand.

19.     At approximately 8:45 p.m., Plaintiff then called Trustbridge, and told them that a local cremation service would pick Michelle up the following day, as was her right by law.

20.     Plaintiff's father passed away in Plaintiff's home and was held overnight by Plaintiff without issue.

21.     Trustbridge told Plaintiff that because Michelle did not have a DNR in place, paramedics would have to declare her deceased.

22.     Trustbridge sent a hospice nurse, Sheila Palacios ("**RN Palacios**"), to Plaintiff's home.

**B.  BBPD Gets Involved, Entering Plaintiff's Home Without Consent**

23.     At approximately 10:50 p.m., BBPD Ofc. Scott arrived outside Plaintiff's home.

24.     City Fire & Rescue—paramedics—were already at the scene.

3

25.     Immediately upon getting out of her vehicle, Ofc. Scott spoke with RN Palacios. A paramedic also approached Ofc. Scott and spoke with her and RN Palacios.

26.     At approximately 10:51 p.m., paramedics entered Plaintiff's home. Shortly thereafter, RN Palacios re-entered Plaintiff's home.

27.     Ofc. Scott stood outside the home's front door.

28.     BBPD Officer Vladimir Alexis attempted to prop open Plaintiff's door. Plaintiff came to the front door, told him to stop, and shut the outer front door.

29.     At approximately 10:54 p.m., BBPD Ofc. Paciello slowly walked up to the front of the home where Ofc. Scott was standing. The two stood and talked for a minute.

30.     There were no exigent circumstances to enter the house.

31.     There was no ongoing medical emergency.

32.     And yet, at approximately 10:55 p.m., and despite another officer already being rebuffed by Plaintiff, the two officers entered Plaintiff's home without knocking or asking permission in anyway. There was no legal or factual basis to do so. There was no reason to believe that Plaintiff, or anyone in Plaintiff's home, had committed or where in the process of committing any legal violation or crime.

33.     At the time, paramedics were utilizing a portable EKG to formally confirm Michelle's death.

34.     The entry of the home is a hallway. The officers were both inside the hallway before Plaintiff saw them. Upon seeing them, Plaintiff immediately objected, saying that they hadn't been "invited" and that they couldn't "just walk in" to her home. The officers kept walking.

35.     Plaintiff asked if they were officers. They said yes. Plaintiff again yelled at them that they "can't just walk in someone's house" because it was "illegal." The officers kept walking.

36.     Plaintiff, distraught at Michelle's death and confused by their presence, allowed them to stay.

37.     RN Palacios began speaking with Ofcs. Paciello and Scott.

38.     Immediately thereafter, the paramedics, having pronounced Michelle deceased, exited. The officers did not.

39.     Plaintiff asked why the police had to be there. There was no response.

40.     At approximately 11:02 p.m., BBPD Sgt. Haas also entered Plaintiff's home without announcing himself. Again, there was no ongoing medical emergency. There were no exigent circumstances. There was no legal or factual basis for Sgt. Haas to enter the house. There was still no reason to believe that Plaintiff, or anyone in Plaintiff's home, was in danger or had committed or was in the process of committing a legal violation or crime.

41.     All BBPD present began looking around Plaintiff's home.

42.     Plaintiff explained to the officers what Michelle's situation had been, and showed them a picture of her, crying.

43.     Plaintiff told all present that a cremation service would pick up her daughter the following morning.

44.     Sgt. Hass ordered Ofc. Paciello to inspect Michelle's body. Ofc. Paciello approached Michelle's body and then inexplicably lifted one of Michelle's eyelids. Again: Michelle had already been pronounced dead by the paramedics. No permission was granted for this touching and no reason was given for why it occurred.

### C.  BBPD Falsely Tell Plaintiff That Her Home Must Reach 32 Degrees Fahrenheit if Her Daughter is to Remain in the Home Until Morning

45.     Florida Statutes, section 497.386(2) states that a "dead human body may not be held in any place or in transit <u>over 24 hours after death</u> or pending final disposition unless the body is

maintained under refrigeration at a temperature of <u>40 degrees Fahrenheit or below</u>[.]" (emphasis added).

46.     The City, through Chief DeGiulio or otherwise, did not adequately train BBPD officers regarding a citizen's right to maintain a decedent for 24 hours or that after 24 hours, a body was to be held at 40 degrees Fahrenheit or below.

47.     Despite the clear language of Fla. Stat. § 497.386, BBPD repeatedly told Plaintiff that her home was required to reach 32 degrees if Michelle's body was to be kept there overnight.

48.     The high in Boynton Beach that day was 88 degrees with an overnight low of 75 degrees.

49.     Due to BBPD's statements, Plaintiff attempted to turn the air conditioning down. It was clear to all that 32 degrees was improbable, if not impossible.

50.     Ofc. Scott stated that "32 [degrees] is going to be hard."

51.     Sgt. Haas stated "I don't think the air condition can get down to 32 degrees" and approached the air conditioning control panel in Plaintiff's living room.

52.     Plaintiff was blunt: Michelle "isn't leaving."

53.     Plaintiff turned her attention to the officers, asking them what they needed "to leave."

54.     Ofc. Scott stated that BBPD needed to "make sure that we know that's going to be happening in the next few hours."

55.     Plaintiff responded that she had already told them what was going to happen.

56.     Ofc. Scott repeatedly made false statements about the 32-degree phantom requirement, insisting that BBPD needed to "make sure it gets to 32 [degrees]."

57.    Plaintiff became angry. She said: "**Out. Get out. I never told you [that] you could come in this house. You're here illegally. I'm done with this. Leave me and my daughter alone. You're fishing. GO. You are no longer welcome in this home. You are here illegally**."

58.    None of the BBPD left the home.

59.    Ofc. Scott stated: "**This is considered a crime scene**."

60.    Plaintiff responded that it was not a crime scene. Ofc. Scott doubled down, saying, "It is [a crime scene] ... we need more information."

61.    Plaintiff repeated, "I need you ladies to leave. You were already in the hallway [when I saw you]."

62.    Ofc. Scott responded that Plaintiff's (accurate) description was "semantics."

63.    No member of BBPD present left the home.

64.    Plaintiff again stated, "You need to leave. You need to leave my home. You walked in without permission. You need to leave. Leave."

65.    For most of their time in the home, including during the above-described exchange, Ofcs. Paciello and Scott were standing closely on either side of Plaintiff.

66.    Throughout this entire interaction Sgt. Haas, Ofc. Paciello and Ofc. Scott utilized their authority to restrain Plaintiff's liberty. Their refusal to leave simply crystalized the dynamic that had been playing out since Ofcs. Paciello and Scott first entered Plaintiff's home uninvited, unannounced, and without legal justification.

67.    Eventually, at Sgt. Haas's command, Ofcs. Paciello and Scott did leave.

68.    Sgt. Haas did not. He continued speaking to Plaintiff without the audio on his body-wearable camera engaged. During this time, Sgt. Haas tried to justify he and his officers conduct, saying that someone in the home could have had a "**gun**" or it **could have been a "hostage**

**situation.**" This, of course, was not true as RN Palacios had called for assistance, paramedics had freely walked into the home to declare death, and no member of BBPD communicated or exhibited any sign of concern for their safety or the safety of anyone in the home.

69.     At some point, Sgt. Haas turned the audio on. He admitted that BBPD was not responsible for facilitating the completion of a death certificate (and, in fact, it was to be handled by Trustbridge). In other words, BBPD's presence was never necessary.

70.     He also admitted that "we can't wait for anyone to turn [the air conditioning] down." But he maintained that Plaintiff could only "keep the body here for 24 hours as long as the temperature is 32 degrees." Again, this is not the law.

71.     Sgt. Haas defended the entry of his officers and himself, stating that "there was a medical emergency" and the BBPD "d[id]n't have to have permission" to enter Plaintiff's home.

72.     Shortly thereafter, Sgt. Haas left the home.

**D.   Plaintiff's Subsequent Attempts to Address the March 27, 2023 Incident**

73.     After midnight, March 28, 2023, Plaintiff and Sgt. Haas had a telephone call. During that call Sgt. Hass stated that because there was a medical call, both the Fire Department and BBPD were dispatched to the home. He also reiterated that no permission to enter the home was needed because of "exigent circumstances."

74.     Plaintiff explained that although she was "not trying to make trouble" she wanted to prevent what had happened to her from happening to other families, saying "please don't put another family through that." She also discussed Florida Statues, section 497.386(2). During the call, Sgt. Haas was googling the laws on maintaining a body under Florida law.

75.     Sgt. Haas then stated that if hospice had not been there (seemingly ignoring that RN Palacios was at the home well before paramedics or police and spoke to both before anyone

from BBPD entered the home), then BBPD would need to "be more involved. . .. but since the [Trustbridge] doctor is going to do the death certificate, police don't have to do an investigation."

76.     In other words, there was never any reason for BBPD to enter Plaintiff's home. Let alone refuse to leave until she complied with a requirement that does not exist or cause her to believe that she could not keep her daughter overnight.

77.     Plaintiff reiterated that the police needed to be aware of the correct procedures in such situations and explained her familiarity with the requirements was because her father had stayed in her home after death.

78.     Sgt. Haas responded that (Michelle's body) "is gonna start smellin after a while."

79.     He then admitted that Plaintiff was within her right to keep Michelle's body for 24 hours.

80.     Plaintiff was so distraught by the police's behavior that she was having medical issues, and her husband suggested she go to the ER. She refused, as that night was to be the only time she would have with her daughter.

81.     On April 24, 2023, Captain Jose Rivera ("**Capt. Rivera**") visited Plaintiff at her home. He told Plaintiff that the reason Ofc. Paciello checked the decedent's eyes was because Plaintiff was "under suspicion" of "strangling" her daughter. This was the first Plaintiff had heard that.  He also defended the BBPD's conduct, saying that it "could have been a hostage situation" and the officers "didn't know what they were walking into." He knew this was false as the officers and paramedics were advised of the situation by RN Palacios outside the home before they entered (and over the phone prior to their arrival).

82.     On April 26, 2023, Plaintiff filed a detailed complaint with the City regarding what happened on March 27, 2024 and in the weeks afterward.

83.     On June 7, 2023, Sgt. Jean Widy (Internal Affairs Professional Assigned Investigator) ("**Sgt. Widy**") spoke to Plaintiff over the phone.

84.     Plaintiff again stated that the officers had entered her home illegally without announcing themselves or being invited. Sgt. Widy said that the officers did not conduct a search and that they entered Plaintiff's home to 'conduct a visual inspection of the decedent per protocol.' There was no mention of the excuses of exigency, medical emergency, or suspicion of foul play that had previously been cited by various members of BBPD.

85.     On June 14, 2023, Sgt. Widy internally recommended 'department wide training' regarding Fla. Stat. § 497.386 and noted that Captain Rivera had recognized that "training/counseling was provided on the date of incident regarding professionalism and courtesy to bravo shift officers; due to the nature sensitivity of the call."

86.     On June 23, 2023, BBPD Chief DeGiulio wrote Plaintiff that the March 27th incident had been the subject of a "thorough review" and that the evidence did not support "the burden of proof required" to sustain Plaintiff's allegations of impropriety and unlawfulness. In so doing, the City, through Chief DeGiulio and otherwise, ratified the conduct of Ofc. Paciello, Ofc. Scott, and Sgt. Haas at Plaintiff's home.

87.     Since the event, Plaintiff has talked with a psychologist regarding the stress of the police action the night her daughter passed and has been treated by multiple physicians as a result of the physical and mental issues she suffered as a result of these events.

<u>**COUNT I – VIOLATION OF § 1983**</u>
**(Fourth Amendment, Failure to Train)**
*as to the City and Chief DeGiulio (official capacity)*

88.     Plaintiff re-incorporates and realleges paragraphs 1-87 as if fully set forth herein.

89.     At all time relevant, Plaintiff possessed a right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure, and to be secure her person, personal effects, and property.

90.     BBPD police arriving to Plaintiff's home on March 27, 2023 were not adequately trained on Florida law pertaining to the disposition of a corpse.

91.     This was the direct result of the City's decision, through Chief DeGiulio and otherwise, not to train these BBPD members on the relevant law.

92.     This reality is exemplified by the conduct of Sgt. Haas, a BBPD veteran of nearly two decades, during his interactions with Plaintiff.

93.     BBPD police frequently respond to calls, of all types, involving deceased persons.

94.     Given the duties of BBPD, the need for such training is patently obvious.

95.     Further, the City's failure, through Chief DeGiulio or otherwise, to institute appropriate policies and training constitutes deliberate indifference towards the needs and rights of its citizens, despite the knowledge that BBPD would frequently come into contact with citizens in similar situations.

96.     This is not the type of situation which required any split-second decision making on the part of police officers. It was by-product of the City's failures. It was avoidable.

97.     As a direct result of these failures, Plaintiff was subjected to an unlawful and unreasonable search and seizure within her home at a time when she was at her most vulnerable.

98.     The conduct she was subjected to was willful, wanton, and undertaken with reckless/callous indifference for Plaintiff's rights, and were taken without any lawful justification and/or in the absence of probable cause.

99.     The City, through Chief DeGiulio and otherwise, acted recklessly, intentionally, or with gross negligence in the deprivation of Plaintiff's constitutional rights.

100.    As a direct and proximate cause of the foregoing violations, Plaintiff suffered deprivation of liberty, indignity, loss of civil rights, which caused actual and consequential damages including mental and physical pain and suffering, emotional distress and anguish, embarrassment, and humiliation.

101.    Plaintiff is entitled to compensation for all of the foregoing as a result as well as compensatory damages, punitive damages, reasonable attorney's fees, and other relief the Court deems appropriate.

### COUNT II –VIOLATION OF § 1983
### (Fourth Amendment, Failure to Train)
### *as to Chief DeGiulio (individual capacity)*

102.    Plaintiff re-incorporates and realleges paragraphs 1-87 as if fully set forth herein.

103.    At all time relevant, Plaintiff possessed a right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure, and to be secure her person, personal effects, and property.

104.    BBPD police arriving to Plaintiff's home on March 27, 2023 were not adequately trained on Florida law pertaining to the disposition of a corpse.

105.    This was the direct result of Chief DeGiulio's failure to ensure that BBPD members received adequate training on the relevant law.

106.   This is exemplified by the conduct of Sgt. Haas, a BBPD veteran of nearly two decades, during his interactions with Plaintiff.

107.   BBPD police frequently respond to calls, of all types, involving deceased persons.

108.   Given the duties of BBPD, the need for such training is patently obvious and objectively should have been obvious to Chief DeGiulio.

109.   Further, Chief DeGiulio failed to institute such policies constitutes deliberate indifference towards the needs and rights of its citizens, despite the knowledge that BBPD would frequently come into contact with citizens in similar situations.

110.   This is not the type of situation which required any split-second decision making on the part of police officers. It was by-product of the Chief DeGiulio's failures. It was avoidable.

111.   As a direct result of these failures, Plaintiff was subjected to an unlawful and unreasonable search and seizure within her home at a time when she was at her most vulnerable.

112.   The conduct she was subjected to was willful, wanton, and undertaken with reckless/callous indifference for Plaintiff's rights, and were taken without any lawful justification and/or in the absence of probable cause.

113.   Chief DeGiulio acted recklessly, intentionally, or with gross negligence in the deprivation of Plaintiff's constitutional rights.

114.   As a direct and proximate cause of the foregoing violations, Plaintiff suffered deprivation of liberty, indignity, loss of civil rights, which caused actual and consequential damages including mental and physical pain and suffering, emotional distress and anguish, embarrassment, and humiliation.

115.    Plaintiff is entitled to compensation for all of the foregoing as a result as well as compensatory damages, punitive damages, reasonable attorney's fees, and other relief the Court deems appropriate.

### COUNT III – VIOLATION OF § 1983
### (Fourth Amendment, Unlawful Seizure)
*as to Defendants Ofc. Paciello, Ofc. Scott, and Sgt. Haas (in their individual capacities)*

116.    Plaintiff re-incorporates and realleges paragraphs 1-87 as if fully set forth herein.

117.    At all time relevant, Plaintiff possessed a right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure, and to be secure her person, personal effects, and property.

118.    Ofcs. Paciello, Scott, and Sgt. Haas all entered Plaintiff's home without consent, a warrant, or other legal justification.

119.    When each entered Plaintiff's home, none had a reasonable basis to suspect that Plaintiff had committed a crime or was about to commit a crime, or that Plaintiff or anyone in the home presented any type of risk.

120.    Ofc. Paciello, Ofc. Scott, and Sgt. Haas all questioned Plaintiff and RN Palacios inside Plaintiff's home.

121.    Ofcs. Paciello and Scott, and Sgt. Haas unreasonably intruded upon Plaintiff's reasonable expectation of privacy in her home.

122.    Sgt. Haas instructed Ofc. Paciello to search Michelle's body (which she did by manipulating the sheets covering Michelle's body and pulling open one of Plaintiff's eyelids that Plaintiff had closed). This was despite Michelle already being pronounced dead by paramedics.

123.    Ofcs. Paciello, Scott, and Sgt. Haas all remained in Plaintiff's home despite being instructed to leave by Plaintiff.

124.    The basis of their refusal to leave was that Plaintiff did not have the temperature of her home to at least 32 degrees Fahrenheit.

125.    Ofc. Paciello, Ofc. Scott, and Sgt. Haas all stated that Plaintiff needed to drop the temperature of her home to 32 degrees Fahrenheit. In South Florida. In the spring. When numerous individuals had been coming and going from the home for hours.

126.    32 degrees Fahrenheit was not only not feasible, it was not the law.

127.    These violations are the type and character to which any reasonable officer would be aware.

128.    The conduct of Ofc. Paciello, Ofc. Scott, and Sgt. Haas, amounts to abuse of power possessed by virtue of state law, made possible only because they were each clothed with the authority of state law. The violations described occurred under the color of state law and are actionable under 42 U.S.C. § 1983.

129.    This conduct was willful, wanton, and in reckless disregard for Plaintiff's rights, and were taken without any lawful justification and/or in the absence of probable cause.

130.    As a direct and proximate cause of the foregoing violations, Plaintiff suffered deprivation of liberty, indignity, loss of civil rights, which caused actual and consequential damages including mental and physical pain and suffering, emotional distress and anguish, embarrassment, and humiliation.

131.    Plaintiff is entitled to compensation for all of the foregoing as a result as well as compensatory damages, punitive damages, reasonable attorney's fees, and other relief the Court deems appropriate.

### COUNT IV – VIOLATION OF § 1983
### (Fourth Amendment, Unlawful Search)
*as to Defendants Ofc. Paciello, Ofc. Scott, and Sgt. Haas (in their individual capacities)*

132.    Plaintiff re-incorporates and realleges paragraphs 1-87 as if fully set forth herein.

133.    At all times relevant, Plaintiff possessed a right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches, and to be secure her person, personal effects, and property.

134.    Ofcs. Paciello, Scott, and Sgt. Haas all entered Plaintiff's home without consent, a warrant, or other legal justification.

135.    When each entered Plaintiff's home, none had a reasonable basis to suspect that Plaintiff had committed a crime or was about to commit a crime, or that Plaintiff or anyone in the home presented any type of risk.

136.    This initial entry into Plaintiff's home violated Plaintiff's right to be free from unreasonable searches as guaranteed by the Fourth Amendment.

137.    Ofc. Paciello, Ofc. Scott, and Sgt. Haas all questioned Plaintiff and RN Palacios in Plaintiff's home.

138.    Sgt. Haas instructed Ofc. Paciello to search Michelle's body (who did by manipulating the sheets covering her body, which was laying in Plaintiff's home, and pulling open an eyelid that Plaintiff had closed). This was despite Michelle already being pronounced dead by paramedics.

139.    Ofcs. Paciello, Scott, and Sgt. Haas all remained in Plaintiff's home despite being instructed to leave by Plaintiff.

140.    These violations are the type and character to which any reasonable officer would be aware.

16

141.     The conduct of Ofc. Paciello, Ofc. Scott, and Sgt. Haas, amounts to abuse of power possessed by virtue of state law, made possible only because they were each clothed with the authority of state law. The violations described occurred under the color of state law and are actionable under 42 U.S.C. § 1983.

142.     This conduct was willful, wanton, and in reckless disregard for Plaintiff's rights, and were taken without any lawful justification and/or in the absence of probable cause.

143.     As a direct and proximate cause of the foregoing violations, Plaintiff suffered deprivation of liberty, indignity, loss of civil rights, which caused actual and consequential damages including mental and physical pain and suffering, emotional distress and anguish, embarrassment, and humiliation.

144.     Plaintiff is entitled to compensation for all of the foregoing as a result as well as compensatory damages, punitive damages, reasonable attorney's fees, and other relief the Court deems appropriate.

**COUNT V – VIOLATION OF § 1983**
**(Fourth Amendment, Unlawful Seizure)**
*as to Defendants Ofc. Paciello, Ofc. Scott, and Sgt. Haas (in their official capacities)*

145.     Plaintiff re-incorporates and realleges paragraphs 1-87 as if fully set forth herein.

146.     At all times relevant, Plaintiff possessed a right under the Fourth Amendment to the United States Constitution to be free from unreasonable seizure, and to be secure her person, personal effects, and property.

147.     Ofcs. Paciello, Scott, and Sgt. Haas all entered Plaintiff's home without consent or a warrant.

148.     When each entered Plaintiff's home, none had a reasonable basis to suspect that Plaintiff had committed a crime or was about to commit a crime, or that Plaintiff or anyone in the home presented any type of risk.

149.     Ofc. Paciello, Ofc. Scott, and Sgt. Haas all questioned Plaintiff and RN Palacios in Plaintiff's home.

150.     Sgt. Haas instructed Ofc. Paciello to search Michelle's body (who did by manipulating the sheets covering her body, which was laying in Plaintiff's home, and pulling open an eyelid that Plaintiff had closed).

151.     This was despite Michelle already being pronounced dead by paramedics.

152.     Ofcs. Paciello, Scott, and Sgt. Haas all remained in Plaintiff's home despite being instructed to leave by Plaintiff.

153.     The basis of their refusal to leave was that Plaintiff did not have the temperature of her home to at least 32 degrees Fahrenheit.

154.     Ofc. Paciello, Ofc. Scott, and Sgt. Haas all stated that Plaintiff needed to drop the temperature of her home to 32 degrees Fahrenheit. In South Florida. In the spring. When numerous individuals had been coming and going from the home for hours.

155.     32 degrees Fahrenheit was not only not feasible, it was not the law.

156.     These violations are the type and character to which any reasonable person would be aware.

157.     The conduct of Ofc. Paciello, Ofc. Scott, and Sgt. Haas, amounts to abuse of power possessed by virtue of state law, made possible only because they were each clothed with the authority of state law. The violations described occurred under the color of state law and are actionable under 42 U.S.C. § 1983.

158.     This conduct was willful, wanton, and in reckless/callous indifference for Plaintiff's rights, and were taken without any lawful justification and/or in the absence of probable cause.

159.     As a direct and proximate cause of the foregoing violations, Plaintiff suffered deprivation of liberty, indignity, loss of civil rights, which caused actual and consequential damages including mental and physical pain and suffering, emotional distress and anguish, embarrassment, and humiliation.

160.     Plaintiff is entitled to compensation for all of the foregoing as a result as well as compensatory damages, punitive damages, reasonable attorney's fees, and other relief the Court deems appropriate.

### COUNT VI – VIOLATION OF § 1983
### (Fourth Amendment, Unlawful Search)
***as to Defendants Ofc. Paciello, Ofc. Scott, and Sgt. Haas (in their official capacities)***

161.     Plaintiff re-incorporates and realleges paragraphs 1-87 as if fully set forth herein.

162.     At all times relevant, Plaintiff possessed a right under the Fourth Amendment to the United States Constitution to be free from unreasonable searches, and to be secure her person, personal effects, and property.

163.     Ofcs. Paciello, Scott, and Sgt. Haas all entered Plaintiff's home without consent, a warrant, or other legal justification.

164.     When each entered Plaintiff's home, none had a reasonable basis to suspect that Plaintiff had committed a crime or was about to commit a crime, or that Plaintiff or anyone in the home presented any type of risk.

165.     This initial entry into Plaintiff's home violated Plaintiff's right to be free from unreasonable searches as guaranteed by the Fourth Amendment.

166.     Ofcs. Paciello, Scott, and Sgt. Haas all remained in Plaintiff's home despite being instructed to leave by Plaintiff.

167.     These violations are the type and character to which any reasonable person would be aware.

168.     The conduct of Ofc. Paciello, Ofc. Scott, and Sgt. Haas, amounts to abuse of power possessed by virtue of state law, made possible only because they were each clothed with the authority of state law. The violations described occurred under the color of state law and are actionable under 42 U.S.C. § 1983.

169.     This conduct was willful, wanton, and in reckless /callous indifference for Plaintiff's rights, and were taken without any lawful justification and/or in the absence of probable cause.

170.     As a direct and proximate cause of the foregoing violations, Plaintiff suffered deprivation of liberty, indignity, loss of civil rights, which caused actual and consequential damages including mental and physical pain and suffering, emotional distress and anguish, embarrassment, and humiliation.

171.     Plaintiff is entitled to compensation for all of the foregoing as a result as well as compensatory damages, punitive damages, reasonable attorney's fees, and other relief the Court deems appropriate.

## REQUEST FOR RELIEF

Plaintiff respectfully requests the Court enter judgment in her favor as follows:

a. Compensatory damages resulting from Defendants' violations of 42 U.S.C. § 1983 to the fullest extent permitted by law;

b. Punitive damages to punish violations of § 1983 to the fullest extent permitted by law;

c. Pre-judgment and post-judgment interest;

d. An award of costs and reasonable attorneys' fees; and

e. Such other relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims.

Dated: March 26, 2025

Respectfully submitted,

By: */s/ Christopher S. Prater*
Christopher S. Prater
Florida Bar No.: 105488
cprater@pollardllc.com

Jonathan E. Pollard
Florida Bar No.: 83613
jpollard@pollardllc.com

**Pollard PLLC**
401 E. Las Olas Blvd., #1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
Facsimile: 866-594-5731
*Attorneys for Plaintiff*

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 26, 2025

*Nadine G Frakes*
Nadine G Frakes (Mar 26, 2025 20:37 EDT)
Signature of Plaintiff

21