UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 25-80396-CIV-CANNON/McCabe

NADINE FRANKES,

       Plaintiff,

v.

CITY OF BOYNTON BEACH *et al.*,

       Defendants.

_____/

## ORDER ACCEPTING REPORT AND RECOMMENDATION IN PART; GRANTING DEFENDANTS' MOTION TO DISMISS, AND DISMISSING WITH PREJUDICE

**THIS CAUSE** comes before the Court upon Magistrate Judge Ryon M. McCabe's Report and Recommendation, issued on October 17, 2025 (the "Report") [ECF No. 35], in which Magistrate Judge McCabe recommends granting Defendants' Motion to Dismiss Plaintiff's Amended Complaint (the "Motion"), with leave to replead [ECF No. 23]. The Court has reviewed the Report, the Motion, Plaintiff's Response [ECF No. 25], Defendants' Reply [ECF No. 31], Plaintiff's Objections to the Report [ECF No. 37], Defendants' Notice of Non-Objection [ECF No. 36], Plaintiff's Amended Complaint [ECF No. 20], and the full record. Upon review, the Court **ACCEPTS IN PART** the Report and Recommendation. The Court **GRANTS** Defendants' Motion to Dismiss and **DISMISSES** Plaintiff's Amended Complaint with prejudice.

## RELEVANT BACKGROUND

Neither party objects to Judge McCabe's recitation of the facts, so, finding no clear error, Court adopts that recitation. *See Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993) ("Because [the plaintiff] did not file specific objections to factual findings by the magistrate judge, there was no requirement that the district court *de novo* review those findings." (citations omitted));

*see also Tonea v. Bank of Am., N.A.*, 6 F. Supp. 3d 1331, 1334 n.2 (N.D. Ga. 2014) ("The parties have not objected to any facts set out in the [report], and finding no plain error in the Magistrate Judge's factual findings, the Court adopts them." (citation omitted)).

To summarize, this case involves "an unfortunate encounter between police and a mother whose daughter had just passed away during in-home hospice care" [ECF No. 35 p. 1]. On March 27, 2023, Plaintiff's daughter passed away while at home in hospice care [ECF No. 35 p. 2]. Hospice called paramedics to declare Plaintiff's daughter deceased [ECF No. 35 p. 2]. Later that evening, paramedics and a hospice nurse arrived at Plaintiff's home [ECF No. 35 p. 2]. Two police officers from the Boynton Beach Police Department ("BBPD"), Officer Scott and Officer Paciello, also arrived shortly afterwards [ECF No. 35 p. 2]. Officer Scott spoke with the paramedics and nurse outside the home, during which the paramedics neither indicated nor suggested that anything improper had incurred inside of Plaintiff's home [ECF No. 35 p. 2].

Plaintiff did not grant Officers Scott and Paciello permission to enter her home, but they nevertheless entered without knocking or seeking permission [ECF No. 35 p. 2]. Sergeant Haas subsequently arrived and likewise entered without announcing, knocking, or seeking permission [ECF No. 35 p. 3]. Paramedics pronounced the daughter deceased and left, while the police stayed [ECF No. 35 p. 3]. The officers looked around Plaintiff's house, and Officer Paciello, upon the direction of Sergeant Haas, inspected the daughter's body without any permission from Plaintiff [ECF No. 35 p. 3]. As part of this inspection, Officer Paciello lifted one of the daughter's eyelids [ECF No. 35 p. 3].

Plaintiff repeatedly requested that the police leave her home [ECF No. 35 p. 3]. The officers did not leave, instead telling Plaintiff that she was prohibited by law from keeping her daughter's body in her home overnight unless the temperature reached 32 degrees Fahrenheit

2

[ECF No. 35 p. 3].  In an effort to comply, Plaintiff lowered her air conditioner in an attempt to get the temperature down to 32 degrees, but it was obvious to everyone present that no amount of air conditioning would suffice given the hot outside temperature [ECF No. 35 p. 3].  Despite Plaintiff's repeated requests that the officers leave her home, the officers insisted that they had to remain until the room reached the requisite temperature [ECF No. 35 pp. 3–4].  Officer Scott described the room as a "crime scene" [ECF No. 35 p. 4].

As it turns out, the officers were mistaken as to the requirements of Florida's corpse handling law: "Florida law provides a 24-hour window before a dead human body must be removed after death or pending final disposition, unless the body can be maintained under refrigeration at 40 degrees Fahrenheit or lower" [ECF No. 35 pp. 18–19 (citing Fla. Stat. § 497.386(2), (7))].  In other words, under that correct understanding, Plaintiff would have had additional hours before she would have been required to have her daughter's body removed from the house (assuming she could not maintain an inside temperature of at least 40 degrees (as opposed to 32)).

Eventually, the officers left Plaintiff's home.  Sergeant Haas attempted to justify the officers' actions to Plaintiff by "explaining that someone in the home could have had a gun or that it could have been a hostage situation" [ECF No. 35 p. 4 (quotation omitted)].  Nearly a month later, on April 24, 2023, Captain Rivera of the BBPD visited Plaintiff at her home and offered several justifications for the officers' actions, including that officers suspected Plaintiff of strangling her daughter and that the situation might "have been a hostage situation" [ECF No. 35 p. 4 (quoting ECF No. 20 ¶ 92)].

## LEGAL STANDARDS

**Review of a Magistrate Judge's Report and Recommendation**

To challenge the findings and recommendations of a magistrate judge, a party must file specific written objections identifying the portions of the proposed findings and recommendation to which objection is made. *See* Fed. R. Civ. P. 72(b)(3); *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989); *Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006). "Frivolous, conclusive, or general objections need not be considered by the district court." *United States v. Schultz*, 565 F.3d 1353, 1361 (11th Cir. 2009) (quotation omitted). A district court reviews de novo those portions of the report to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1). To the extent a party fails to object to parts of the magistrate judge's report, the Court may accept the recommendation so long as there is no clear error on the face of the record. *Macort*, 208 F. App'x at 784.

**Rule 12(b)(6) Motions to Dismiss**

Rule 8(a)(2) requires complaints to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To avoid dismissal under Rule 12(b)(6), a complaint must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* Fed. R. Civ. P. 12(b)(6). A claim for relief is plausible if the complaint contains factual allegations that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 545). "[C]onclusory allegations, unwarranted deductions of

facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

**Fourth Amendment Search and Seizure**

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.   Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *E.g.*, *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).   "One exception to the warrant requirement is that the police may enter a private premises and conduct a search if exigent circumstances mandate immediate action." *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011) (quotation omitted).   Examples of exigent circumstances include "danger of flight or escape, loss or destruction of evidence, risk of harm to the public or the police, mobility of a vehicle, and hot pursuit." *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002).   "One of the most compelling events giving rise to exigent circumstances is the occurrence of an emergency situation." *Id.* at 1335.   "The most urgent emergency situation excusing police compliance with the warrant requirement is, of course, the need to protect or preserve life," and thus, "emergency situations involving endangerment to life fall squarely within the exigent circumstances exception." *Id.* at 1335, 1337.

"For this exception to apply, the officer must have both exigent circumstances and probable cause." *Roberts*, 643 F.3d at 905.   "[I]n an emergency, the probable cause element may be satisfied where officers reasonably believe a person is in danger." *Holloway*, 290 F.3d at 1338.

***Monell* Claims**

Municipalities and local governments can be sued under 42 U.S.C. § 1983 "for their own

illegal acts," but they "are not vicariously liable under § 1983 for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quotation omitted). "Instead, to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004). "Generally, random acts or isolated incidents are insufficient to establish a custom or policy." *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1131 (11th Cir. 2021) (quotation omitted). These types of claims are known as *Monell* claims, named after the Supreme Court case *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

Under "limited circumstances," a "failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (footnote omitted). A city, however, "is not automatically liable under section 1983 even if it inadequately trained or supervised its police officers and those officers violated [a person's] constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Rather, the Supreme Court has limited these circumstances to "where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights." *Id.* Thus, "a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* "[W]ithout notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Id.* at 1350–51.

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563

U.S. at 62 (quotation omitted).  An exception to this ordinary requirement exists where "the need to train and supervise in a particular area is so obvious that liability attaches for a single incident." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1329 (11th Cir. 2015) (quotation omitted).  Such a need is obvious "in a narrow range of circumstances" where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 409 (1997).  These circumstances involve "likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."  *Id.*

**Supervisory Liability under § 1983**

Separate and apart from *Monell* liability, a party may also assert § 1983 claims against supervisors, subject to an "extremely rigorous" standard.  *Myrick v. Fulton Cnty., Georgia*, 69 F.4th 1277, 1297 (11th Cir. 2023) (quotation omitted).  This standard requires a plaintiff to "allege facts that show a causal connection between [the supervisor's] actions and the alleged constitutional deprivation."  *Id.* at 1297–98 (quotation omitted).

> A causal connection may be established when: (1) a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; (2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or (3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so.

*Id.* at 1298 (quotation omitted).

For the first circumstance to apply, "deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences."  *Id.* at 1298.  Establishing the second circumstance "requires showing a persistent and wide-spread practice," and "[a] single incident of a

constitutional violation is insufficient to prove a policy or custom even when the incident involves several subordinates." *Id.* at 1299. Finally, to establish the third circumstance, the supervisor must have "personally directed the Officers to act unlawfully" or have known "they would do so and failed to stop them." *Id.* at 1298.

**Qualified Immunity**

Qualified immunity "protects government officials performing discretionary functions from civil litigation and liability if their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known." *Aguirre v. Seminole Cnty.*, 158 F.4th 1276, 1296 (11th Cir. 2025) (citation omitted). "It accomplishes this protection by granting officials immunity from suit, meaning an entitlement not to stand trial or face the other burdens of litigation." *Id.* (quotations omitted). As such, "[a] district court must adjudicate a defense of qualified immunity at whatever stage it is raised." *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1334 (11th Cir. 2025); *see also Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) ("[Q]ualified immunity questions should be resolved at the earliest possible stage of a litigation."). In fact, a district court errs when it fails to rule "on [an official's] entitlement to qualified immunity upon a motion to dismiss," and thus, "an entitlement to qualified immunity raised on a motion to dismiss *will* be granted if the complaint fails to allege the violation of a clearly established constitutional right." *Miller*, 129 F.4th at 1333–34 (alterations adopted) (quotation omitted).

"When an official asserts qualified immunity, the district court must consider the issue on a claim-by-claim and defendant-by-defendant basis." *Id.* at 1333. "The district court must first decide whether the defendant was engaged in a discretionary function." *Id.* (quotation omitted). In making this determination, the court asks, "whether the government employee was

(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

If the government official was engaged in a discretionary function, "the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity." *Id.* at 1264. "To overcome qualified immunity at the motion-to-dismiss stage, the plaintiff must plead sufficient facts to allege that: (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time of the alleged violation." *Wall-DeSousa v. Fla. Dep't of Highway Safety & Motor Vehicles*, 691 F. App'x 584, 589 (11th Cir. 2017); *see also Holloman*, 370 F.3d at 1264. As to that second prong, "the contours of a right must be sufficiently clear such that every reasonable officer would have understood his conduct to violate that right." *Aguirre*, 158 F.4th at 1296. "The law must not be defined at a high level of generality[] but rather be particularized to the facts of the case." *Id.* at 1297 (citation omitted).

> A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291–92 (11th Cir. 2009).

## DICUSSION

### I.      The Court accepts the Report's conclusion that the officers did not conduct an unlawful search.

Both the Report and Defendants' Motion cite a litany of cases all holding that a report of a dead body constitutes an exigent circumstance [ECF No. 35 pp. 9–11; ECF No. 23 pp. 15–17]. Based upon this authority, the Report concludes that the report of a dead body is an exigent circumstance [ECF No. 35 pp. 9–11]. This exigent circumstance, the Report reasons, permitted

the officers to make warrantless entry into Plaintiff's home, along with a cursory protective sweep and inspection of the body [ECF No. 35 pp. 8–11]. The Report also determines that all of the officers' actions were "discretionary functions" for purposes of qualified immunity [ECF No. 35 pp. 7–8]. The Report thus "finds no Fourth Amendment violation, let alone a 'clearly established' Fourth Amendment violation, in Defendants' initial entry into, and search of, Plaintiff's home" [ECF No. 35 p. 11].

Plaintiff objects, attempting to distinguish these cases. According to Plaintiff, because she alleged that "there was no question that no one in the home needed immediate aid and that there was no reasonable basis to believe otherwise," there was no emergency and thus "a clear difference between the facts alleged by Plaintiff" and the cases cited the Report [ECF No. 37 p. 4]. Plaintiff further argues that her "burden was to plausibly allege that . . . her Fourth Amendment right to be free from a warrantless search was violated" [ECF No. 37 p. 4]. Plaintiff thus submits that the officers' sweep of her home also violated the Fourth Amendment, and that even if exigent circumstances existed, the officers went beyond the scope of a permissible sweep when they lifted the daughter's eyelids and manipulated the daughter's bedsheets [ECF No. 37 pp. 5–6]. As for qualified immunity, Plaintiff takes issue with the Report's conclusion that the police were engaged in a discretionary function and argues that the officers were not engaged in a discretionary function because "BBPD officers always enter a home after a report of a dead body" and thus "entry into Plaintiff's home was not discretionary, but was carried out as part of their City-mandated orders" [ECF No. 37 p. 3].

Upon de novo review, the Court disagrees with Plaintiff and agrees with the Report. First, as both the Report and Defendants' Motion correctly note, numerous cases hold that the report of a dead body is an exigent circumstance [*see* ECF No. 35 pp. 9–11; ECF No. 23 pp. 15–17]. This

includes binding Eleventh Circuit precedent:

> Acting in response to reports of 'dead bodies,' the police may find the 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients.  But the business of policemen and firemen is *to act*, not to speculate or meditate on whether the report is correct.  People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process.  Even the apparently dead often are saved by swift police response.

*E.g.*, *Holloway*, 290 F.3d at 1340 (quotation omitted).  While Plaintiff tries to distinguish these cases by saying that no one actually needed aid in this case, Plaintiff fails to understand that the emergency is the report of a dead body and the chance that the "dead" person is not actually dead, not whether or not the body actually turns out to indeed be a deceased person.  *See id.* ("The fact that no victims are found, or that the information ultimately proves to be false or inaccurate, does not render the police action any less lawful.").  Significantly, Plaintiff provides no cases holding that the report of a dead body is not an exigent circumstance—a notable omission in light of all the aforementioned precedent holding that such reports do constitute exigent circumstances.  In fact, the one case Plaintiff cites to argue that there was no "emergency situation" did not involve a dead body whatsoever [*see* ECF No. 37 p. 4 (quoting *Moore v. Pederson*, 806 F.3d 1036, 1045 (11th Cir. 2015))].

Second, even if the report of a dead body here did not constitute an exigent circumstance, the officers are entitled to qualified immunity on the facts alleged.  Plaintiff's argument regarding discretionary functions misunderstands the definition of "discretionary" in the qualified immunity context as defined by the Eleventh Circuit in *Holloman*.  There, the Eleventh Circuit explained that, in the qualified immunity context, a "discretionary function" is not "an activity requiring the exercise of independent judgment" but rather "include[s] actions that do not necessarily involve an element of choice.  *Holloman*, 370 F.3d at 1265 (footnote omitted) (quotation omitted).  When officers are "performing a legitimate job-related function . . . through means that were within

[their] power to utilize," they are performing a discretionary function. *Id.* at 1265.  Thus, the Report rightly concluded that the officers engaged in a discretionary function.

The burden therefore shifted to Plaintiff to demonstrate that qualified immunity does not apply. *Id.* at 1264.  Given the foregoing cases—and especially given Plaintiff's failure to cite any contrary authority—Plaintiff has, at a minimum, failed to meet her burden to show that a "clearly established" Fourth Amendment violation took place so as to overcome qualified immunity. *Id.* at 1265.  For the same reason, it cannot be said that the law "clearly established" that warrantless entry upon the report of a dead body violates the Fourth Amendment.

Third, Plaintiff's challenges to the protective sweep fail.  As the Report correctly notes (and Plaintiff does not challenge), when officers enter a home without a warrant pursuant to exigent circumstances, the officers may do a protective sweep [ECF No. 35 p. 10].  Because exigent circumstances existed in this case, the officers permissibly did a cursory sweep of the house and the daughter's body.  Plaintiff objects that the "manipulation of bedding . . . objectively went beyond a 'plain view' search" [ECF No. 37 pp. 5–9].  But the law simply requires that this sweep be "strictly circumscribed by the exigencies which justify its initiation." *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (quotation omitted).  Here, the exigency involved the report of a dead body and potential danger to life.  Checking the body in the sheets is directly related to ensuring that the deceased body is not actually alive and does not go beyond exigent circumstances at hand.

Therefore, the Court overrules these objections and accepts the Report and Recommendation to dismiss Counts 10, 11, and 12.[1]

---

[1] Though not clearly asserted, Plaintiff also seems to object to the Report's conclusion that the officers reasonably believed an exigent circumstance existed [ECF No. 37 p. 5].  For the reasons stated above, the Court agrees with the Report that the report of a dead body is an exigent circumstance.  The Report notes (with no dispute or objection from Plaintiff) that the officers had a report of a dead body inside Plaintiff's home [ECF No. 35 p. 2].  Thus, given this report, the

II.     **The Court accepts the Report's conclusion that the officer's seizure of Plaintiff is protected by qualified immunity**.

The Report concludes that the officers seized Plaintiff within the meaning of the Fourth Amendment because "a reasonable person in Plaintiff's position would not have felt free to leave her home and/or terminate the encounter with police" [ECF No. 35 p. 15].  Neither party objects to this finding.  The Report then determines that Plaintiff's seizure amounted to a *Terry* stop—i.e., "detain[ing] a person briefly for an investigatory stop" when police "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000).[2]  The Report finds that "the Amended Complaint suggests two types of criminal activity" [ECF No. 35 p. 17]:  first, the reasonable and articulable suspicion that Plaintiff's daughter may not have died from natural causes [ECF No. 35 p. 17], and second, the officers' (mistaken) suspicion that Plaintiff was committing a violation of Florida's corpse-storage laws [ECF No. 35 pp. 18–19].  As to that second suspicion, while the officers were wrong as a matter of Florida law, the Report explains that qualified immunity still protects officers who make reasonable mistakes of law [ECF No. 35 pp. 19–20].  The Report concludes that the officers mistake "was not so unreasonable as to trigger a loss of qualified immunity," noting that the officers' were mistaken on merely two areas: "(1) the omission of the 24-hour waiting period, and (2) the difference between 32 and 40 degrees Fahrenheit" [ECF No. 35 p. 20].

_____

officers had probable cause to believe an exigent circumstance existed.  *See Roberts*, 643 F.3d at 905; *Holloway*, 290 F.3d at 1338.  Plaintiff resists this conclusion by asserting that she "plausibly allege[d] the lack of exigent circumstances" [ECF No. 37 p. 5].  As the Report properly notes, however, a court need not accept these legal conclusions as true [*see* ECF No. 35 pp. 10–11]. *See also Iqbal*, 556 U.S. at 678–79.

[2] The name "*Terry* stops" stems from the Supreme Court case which established the constitutionality of such stops: *Terry v. Ohio*, 392 U.S. 1 (1968).

Plaintiff objects to the Report and maintains that "[t]here was never a basis for a *Terry* stop of Plaintiff in her own home" [ECF No. 37 p. 7].   She argues that (1) there were no exigent circumstances to justify an initial entry into Plaintiff's home and thus no exigent circumstances to justify a *Terry* stop; (2) a *Terry* stop cannot be initiated on facts unrelated to the exigent circumstances justifying warrantless entry; (3) the officers had no reasonable articulable suspicion because any such suspicion was created as "excuses" with "zero basis in the facts (in their totality or isolated) that were present to BBPD" in response to Plaintiff's becoming "upset with their refusal to leave"; and (4) the officers' conduct was not "reasonable" and was "plainly incompetent" as to be determined following discovery (not on the pleadings) [ECF No. 37 pp. 7–8].

Upon de novo review, the Court agrees with the Report that the officers are entitled to qualified immunity for making a *Terry* stop within Plaintiff's home.   The Eleventh Circuit has held that *Terry* stops can take place within a home when exigent circumstances are present, *see Moore v. Pederson*, 806 F.3d 1036, 1039 (11th Cir. 2015)—and that principle applies here based on the underlying exigency warranting entry into the home (as discussed *supra*) [*see* ECF No. 35 p. 16; ECF No. 37 p. 7].   It is true, as the Report observes, that the Eleventh Circuit has not addressed "whether police may conduct a *Terry* stop inside a home after they have entered the home based on exigent circumstances but thereafter encounter facts, unrelated to the initial exigency, that give rise to a reasonable suspicion of criminal activity" [ECF No. 35 p. 16 n.1].   Ultimately, however, as the Report correctly notes and Plaintiff fails to even address, "to the extent the Eleventh Circuit has not yet decided this precise issue, qualified immunity would protect the officers' conduct" [ECF No. 35 p. 16 n.1].   Thus, at the very least, Plaintiff has not shown the law is "clearly established" on this issue, so Plaintiff has not met her burden to overcome qualified immunity.

*See Holloman*, 370 F.3d at 1264; *Miller*, 129 F.4th at 1333–34.

Second, the Report rightly finds that the officers had reasonable articulable suspicion that Plaintiff's daughter died from unnatural, criminal causes.  In examining whether the police had reasonable articulable suspicion, the Court views this question "from the standpoint of a reasonable police officer at the scene . . . based on the totality of the circumstances." *Evans v. Stephens*, 407 F.3d 1272, 1280 (11th Cir. 2005) (citations omitted).  And, where "an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had arguable reasonable suspicion to support an investigatory stop." *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000) (quotation omitted).  This is a "low bar." *E.g.*, *United States v. Black*, No. 24-CR-113, 2025 WL 2418485, at *4 (M.D. Fla. Aug. 21, 2025).

When viewing the totality of the circumstances as laid forth in the Amended Complaint [ECF No. 20], taking all facts as true and drawing all inferences in Plaintiff's favor, the officers had arguable reasonable suspicion that the daughter died from unnatural causes.  As the Report notes, "the Amended Complaint alleges that Defendants arrived at the scene pursuant to a medical call and that they found a dead human body inside the home" and the "deceased was in her late thirties or early forties at the time of death" [ECF No. 35 p. 17 (citing ECF No. 20 ¶¶ 10–11, 27–28, 35, 84)].  These facts overcome the low bar of providing arguable reasonable suspicion to the officers, and Plaintiff is thus incorrect to assert that any suspicion had "zero basis in the facts (in their totality or isolated)" [ECF No. 37 p. 8].[3]  Accordingly, the Report correctly concludes that "Defendants clear the low bar of arguable reasonable suspicion of death by non-natural causes"

---

[3] While Plaintiff argues that this suspicion was made up in response to her refusal to allow the officers to remain in her home [ECF No. 37 p. 8], these facts—as pled by the Complaint—existed and were evident to the officers independent of her refusals [*see* ECF No. 20 ¶¶ 10–11, 27–28, 35, 84].  Again, all that is necessary for qualified immunity to apply is "arguable reasonable suspicion," which these facts provide.  *See Jackson*, 206 F.3d at 1166.

[ECF No. 35 p. 18].

Third, even apart from the reasonable articulable suspicion that the daughter's death was from unnatural causes, the Court agrees with the Report that the officers' mistake of law—i.e., that they had reasonable articulable suspicion to detain Plaintiff under Florida's corpse storage law—was not so unreasonable or plainly incompetent so as to overcome qualified immunity [ECF No. 35 pp. 19–20]. "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation omitted). Still, any such mistake must be "reasonable." *E.g.*, *Hardigree v. Lofton*, 992 F.3d 1216, 1227–28 (11th Cir. 2021); *see also Eves v. LePage*, 927 F.3d 575, 588 (1st Cir. 2019) ("[A] reasonable mistake of law does not defeat qualified immunity."). The Court agrees that the officer's mistake of law, having fallen short "in only two material respects," was not "so unreasonable as to trigger a loss of qualified immunity" [ECF No. 35 p. 20].

As a final point in this section, Plaintiff is mistaken to assert that the question of an officers' reasonableness should not be adjudicated "at the pleadings stage" [ECF No. 37 p. 8]. "[A]n entitlement to qualified immunity raised on a motion to dismiss *will* be granted if the complaint fails to allege the violation of a clearly established constitutional right." *Miller*, 129 F.4th at 1333–34 (alterations adopted) (quotation omitted). Additionally, the question of reasonableness is a question of law, as Plaintiff concedes [ECF No. 37 p. 8]. *See also Stone v. Peacock*, 968 F.2d 1163, 1166 (11th Cir. 1992) ("The law is now clear, however, that the defense of qualified immunity should be decided by the court, and should not be submitted for decision by the jury."); *Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007) ("[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly

answered by the court, not a jury." (citation omitted)).  Thus, Plaintiff's allegations of law—such as her allegation that the officers were "plainly incompetent"—need not be taken as true.  *See Iqbal*, 556 U.S. at 678–79.  Rather, the question is whether, at the pleading stage, Plaintiff has met her burdens: to allege facts that one, when taken as true, plausibly state a claim for relief, *see id.*, and two, overcome qualified immunity, *see Wall-DeSousa*, 691 F. App'x at 589; *Holloman*, 370 F.3d at 1264; *Miller*, 129 F.4th at 1333–34.  In other words, Plaintiff must allege facts that, when taken as true, that "plausibly give rise" to the "reasonable inference" that the officers' mistake of law was unreasonable and plainly incompetent.  *See Iqbal*, 556 U.S. at 678–79.  Plaintiff has not met this burden; Plaintiff has failed to plead facts showing a Fourth Amendment violation or a clearly established violation of the Fourth Amendment so as to overcome qualified immunity.

The Court therefore accepts the Report and Recommendation, overrules Plaintiff's objections, and dismisses Counts 4, 5, and 6.

## III. The Court accepts the Report's recommendation that the *Monell* failure-to-train claim should be dismissed.

The Report determines that Plaintiff failed to allege "any materially similar constitutional violations, prior to the events of Plaintiff's own case, that would have put the City [of Boynton Beach] on notice of a need for officer training regarding this [corpse storage] statute" [ECF No. 35 pp. 21–24].  The Report also rejects Plaintiff's argument that the need for training on Florida's corpse storage was obvious [ECF No. 35 pp. 21–24].  Plaintiff objects to the Report, maintaining that the need to train was "obvious" [ECF 37 pp. 8–10].[4]  But she cites only a single incident—

---

[4] Plaintiff also states that her *Monell* claim survives as it pertains to the officers' entry.  The Court has already determined in this Order, however, that the officers' entry was constitutionally permissible.  Thus, Plaintiff cannot state a *Monell* claim predicated upon that injury.  *See McDowell*, 392 F.3d at 1289 (noting that, for a *Monell* claim, "a plaintiff must show . . . that [her] constitutional rights were violated").

this case—to support an erroneous application of Florida's corpse storage law [ECF No. 21 p. 7].

Without more, Plaintiff has failed to plead facts that show any "likelihood that the situation will

recur" or "predictability that an officer lacking specific tools to handle that situation will violate

citizens' rights." *See Bryan Cnty.*, 520 U.S. at 409.  Thus, the Report correctly determines that

Plaintiff has not alleged a high likelihood that "BBPD officers will repeatedly encounter dead

bodies and thereafter predictably make unlawful Terry stops and full-scale arrests due to their lack

of training on Florida corpse-storage law" [ECF No. 35 p. 23].  Plaintiff's objection to the Report's

recommended dismissal of Count 1 is overruled.

## IV.    The Court accepts the Report's recommendation that the individual-capacity claim against Chief DeGiulio should be dismissed.

The Report also concludes that Plaintiff fails to establish a causal connection between the

*Terry* stop and Chief DeGiulio so as to state a claim for § 1983 supervisory liability [ECF No. 35

p. 25].  As the Report notes, Plaintiff does not "allege, for example, facts that show a history of

widespread misapplication of Florida corpse-storage law by BBPD officers, sufficient to put Chief

DeGiulio on notice of a need for correction or training in this area" or "personal participation by

Chief DeGiulio" [ECF No. 35 p. 25].  Plaintiff objects to this conclusion, offering the general

allegation that "it was Chief DeGiulio's responsibility to ensure that protocols and guidelines

applicable to BBPD were promulgated, and that training in connection with same was adequate"

[ECF No. 37 p. 10].

On de novo review, the Court rejects Plaintiff's objection.  Causal supervisory liability

under § 1983 would exist in this case only if Plaintiff had alleged facts showing a causal connection

between Chief DeGiulio's actions and the alleged constitutional deprivation." *Myrick*, 69 F.4th at

1298.  Plaintiff has not done so here—at all—relying simply on conclusory and general allegations

that Chief DeGiulio had "oversight" and "responsibility" for promulgating "protocols and

guidelines" [ECF No. 37 p. 11].  Even accepting that proposition as true, that allegation reveals Chief DeGuilio's supervisory role and certainly does not show "a causal connection" under any of the three circumstances enumerated in *Myrick*.  *See* 69 F.4th at 1298.  Plaintiff has thus failed to "allege facts" that show either constitutional "deprivations" of "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences" by BBPD, "a persistent and wide-spread practice" of such deprivations in BBPD, or any personal direction or knowledge by Chief DeGiulio.  *See id.* at 1298–99.

**V.     The Court agrees with the Report and dismisses the official capacity claims**.

The Report determines that Plaintiff's official capacity claims are duplicative of her *Monell* claim against the City [ECF No. 35 p. 26].  While Plaintiff concedes that her official capacity claim against Chief DeGuilio is duplicative, Plaintiff maintains that the other official capacity claims should survive, objecting that "those claims are not predicated upon a failure to train but a direct violation of the Fourth Amendment" [ECF No. 37 p. 11].

Plaintiff's argument fails.  Plaintiff fails to acknowledge that her official-capacity claims are "only another way of pleading an action against an entity of which an officer is an agent."  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  For these suits to go forward then, Plaintiff must allege facts that, if taken as true, would be sufficient to state a claim against the entity—here, the City of Boynton Beach (the "City").  As noted *supra*, however, the City is "not vicariously liable under § 1983 for [its] employees' actions."  *Connick*, 563 U.S. at 60 (quotation omitted).  Thus, to bring a claim against the City based upon the officers' conduct, Plaintiff must proceed under a theory of *Monell* liability—i.e., that the City had "a custom or policy that constituted deliberate indifference to [Plaintiff's] constitutional right[s]" and that "the policy or custom caused the violation."  *See McDowell*, 392 F.3d at 1289.

The only policy or custom Plaintiff argues, however, is that of a failure to train; she does

not point to any other policies or customs that she claims caused her a Fourth Amendment injury [*see* ECF No. 20 ¶¶ 217–269, 310–349; ECF No. 25 p. 8; ECF No. 37 p. 11].  Either Plaintiff relies on the failure to train theory, in which case her official capacity claims are duplicative, or Plaintiff has failed to plead any other types of policy or custom, in which case her official capacity claims fail to state claims under *Monell*.  Thus, the Court accepts the Report and Recommendation and dismisses Counts 2, 7, 8, 9, 13, 14, and 15.

## VI.    **The Court dismisses the Complaint with prejudice**.

While the Report recommends granting leave to replead [ECF No. 23 pp. 26–27], and neither party objects to this recommendation [*see* ECF Nos. 36, 37], the Court sees no basis for repleading and rejects the Report's recommendation on that issue. *See* 28 U.S.C.A. § 636(b)(1) ("A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.").

"A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002); *see also Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 862 (11th Cir. 2023) ("A district court may dismiss a complaint with prejudice where the plaintiff fails to request leave to amend, or where the complaint could not be more carefully drafted to state a valid claim."); *Pop v. LuliFama.com LLC*, 145 F.4th 1285, 1298 (11th Cir. 2025) (holding that "because [the plaintiff] failed to properly request leave to amend, the district court did not err in dismissing his complaint with prejudice").

Here, Plaintiff has not filed a motion for leave to amend.  While Plaintiff does request leave to amend "on the last page of [her] response in opposition to the defendants' motions to dismiss,"

it is not sufficient to embed the request within an opposition memorandum. *See Pop*, 145 F.4th at 1298 (alteration adopted) (quotation omitted).  Moreover, even if such a request were sufficient to preserve a proper request to amend, which it is not, Plaintiff still does not say in her embedded statement what facts she could plead to state a claim or to overcome qualified immunity.  On top of that, Plaintiff already amended her complaint once before under Fed. R. Civ. P. 15 [ECF Nos. 1, 20], and she has not explained how a third complaint in this case could overcome the factual and legal barriers to her claim identified by the Court *supra*.  Accordingly, the Court rejects the Report's recommendation and dismisses Plaintiff's Amended Complaint with prejudice.

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. The Report and Recommendation [ECF No. 35] is **ACCEPTED IN PART**.

2. Defendants' Motion to Dismiss Plaintiff's Amended Complaint [ECF No. 23] is **GRANTED**.

3. Plaintiff's Amended Complaint [ECF No. 20] is **DISMISSED WITH PREJUDICE**.

4. Final Judgment to enter by separate order.

**ORDERED** in Chambers in Fort Pierce, Florida, this 5th day of February 2026.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record